# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF FLORIDA

Cailin Nicole Soloff (Pro Se)
Dylan Michael Soloff (Pro Se)
and as friends of minors
B.S. and L.S.
As Former Wards and as Beneficiaries of
The Estate of Jeremy Maxwell Soloff,
The 2005 Life Insurance Irrevocable Trust of
Jeremy Maxwell Soloff,
The 1994 Irrevocable Deed of Trust
Of Meghan Ellen Holtz Soloff,
A.M.M.T - A Family Limited Partnership,
Custodial Account of Cailin Nicole Soloff,
Custodial Account of Dylan Michael Soloff,
Custodial Account of B.S,
Custodial Account of L.S

Plaintiff(s)

vs.

Case No. 2:17-CV-426-FLM-38CM

Roetzel and Andress - A Legal Professional Association
Cathy Reiman, Esq.
Lorna Scharlachen, Esq.
Tamara Nicola, Esq.
Defendant(s)

**COMPLAINT**

**<u>Jury Trial Demanded on All Counts so Triable</u>**

## Jurisdiction and Venue

1.  Plaintiff Cailin Soloff is a student beginning her sophomore year at the University of Southern California in Los Angeles, California and whose principal residence is 31622 Fairview Rd. Laguna Beach, CA 92651. Cailin Soloff was a ward of the Court and a beneficiary to the above mentioned fiduciary accounts and partnership.

2. Plaintiff Dylan Soloff is a student beginning his freshman year at the University of Southern California in Los Angeles, California and whose principal residence is 31622 Fairview Rd. Laguna Beach, CA 92651. Dylan Soloff was a ward of the Court and a beneficiary to the above mentioned fiduciary accounts and partnership.

3. B.S and L.S , are both minor children and the brothers of the above named plaintiffs whose principal residence is located at 31622 Fairview Rd. Laguna Beach, CA 92651. They were both wards of the court and beneficiaries to the above mentioned fiduciary accounts and partnership.

4. Defendant Roetzel and Andress is a full-service law firm that provides comprehensive, integrated legal counsel to local, regional, national and international clients. Roetzel and Andress holds vicarious liability through their employment of Cathy Reiman, Esq. Their principal place of business is 850 Park Shore Drive, Trianon Centre, 3rd Floor, Naples, FL 34103

5. Defendant Cathy Reiman is a Partner at Roetzel and Andress currently providing legal services and doing business at 850 Park Shore Drive, Trianon Centre, 3rd Floor, Naples, FL 34103

1

6. Defendant Lorna Scharlachen is an individual currently providing legal services and doing

business at the law firm of Cohen and Grigsby as a Director of the Firm and a member of its

Estates and Trusts Group at Mercato- Suite 6200 9110 Strada Place, Naples, FL 34108-2938.

7. Defendant Tamara Nicola is an individual currently providing legal services and doing

business at Nicola Family Law at 681 Goodlette Road North Suite 210, Naples, FL 34102

8. Defendants actions caused tortious injury to Plaintiffs by an act or omission in the State of

Florida while regularly doing business in the State of Florida and deriving substantial revenue

from services rendered in the State of Florida. This Court therefore has personal jurisdiction over

Defendants pursuant to Florida General Laws.

9. The citizenship of Defendants on the one hand, and Plaintiffs on the other, is diverse, and the

amount in controversy exceeds $75,000, exclusive of interests and costs. This Court therefore

has diversity jurisdiction over this case pursuant to 28 U.S.C. 1332.

10. Plaintiffs were illegally deprived of their property without Due Process of Law under the

14th Amendment and judgment as a matter of federal due process, may not bind or bar them

from an unconstitutional deprivation of their property. Plaintiffs are requesting declaratory

judgment from this court to be named as parties. This Court has Federal Jurisdiction under 28

U.S.C. 1331.

11. Venue is proper in this district because the cause of actions occurred in Florida and the

majority of real property herein was located in Florida and governed under the Laws of Florida

**Preliminary Factual Allegations Applicable to All Counts**

12.  On November 18, 2006 Plaintiff's father tragically died at only 38 years old in Naples,

Florida. Plaintiffs were 9, 7, 4 and 10 months at the time of his death.

13. In 2007, the Florida Court appointed plaintiff's grandfather, Albert M. Holtz, as the guardian of both their person and property. At the time he was appointed the children's guardian, Albert M. Holtz stated that he had no conflicts of interest and the children had zero assets.

14. This in fact was not true. Plaintiff's grandfather held multiple conflicts of interest. He was the trustee to the plaintiff's and their mother's 1994 Irrevocable Trust, he was the custodian to all of the plaintiff's individual custodial and coverdell accounts, he was general partner of the family limited partnership (in which the plaintiff's held a limited partnership interest) and he was the personal representative of plaintiff's father's estate.

15. The Will of plaintiff's father, Jeremy Soloff dated May 2005, appointed plaintiff's mother, Meghan Soloff as the Personal Representative of their father's Estate. At the time of his death, plaintiff's mother still reeling from the tragic death of her husband, shortly after miscarried twin children, for which she had to be hospitalized. She was incapable of carrying out her husband's wishes and emotionally devastated. She turned to the one person she felt she could trust, plaintiff's grandfather and her father, Albert M. Holtz.

16. At his request, plaintiff's mother signed over the personal representation of her husband's estate and her Power of Attorney. Plaintiff's grandfather then retained attorney Rob Buckell from the law firm of Porter Wright to assist him in his administrative duties.

17. The children's father's estate consisted of four properties, one in California, two in Naples and one in Costa Rica. (Valuations were done on these at time of death) Plaintiff's father's business partnerships consisted of over a dozen LLC's, S-Corp's and partnerships. Those partnerships held Hotels, Shopping Centers, Gas And Oil rights, Gas companies, Mining rights, Office Buildings, Land Deals and various

other real estate and investment holdings. The business interests were worth between 3 to 4 million at the time of Plaintiff's father's death on November 18, 2006. The furnishings in the homes in California and Naples were worth $200,000.The children's deceased father also owned a Masarati and a Boat. (Bank account statements, partnership documents and financial affidavits provide proof as to the exact amount of loss to these assets) The sole beneficiaries to this estate were plaintiffs and their mother under the Will of Jeremy Soloff dated November 2005.

18. The children's father had also taken out a $2.5 million dollar life insurance policy to protect his young family. Plaintiff's father then went to the Law Firm of Quarles and Brady and had that life insurance policy set up under an Irrevocable Trust, thereby insuring it would hold extra protection for his family. The sole beneficiaries to this trust were plaintiffs and their mother under the terms of the 2005 Irrevocable Trust of Jeremy M. Soloff.

19. The children's mother provided 5 bankers boxes filled with her husband's business interests, a financial affidavit he had filled out to the bank in 2005 and their financial planning documents that showed the value of those business interests from 2005. Additional partnerships had been acquired over the next year and a half.

20. Attorney Buckell filed a petition with the court and was successful in having the minor children's father's Masarati declared exempt from the estate. It was court ordered to the mother and declared to have a net value of $34,000.

21. Attorney Buckell had placed two of the properties up for sale. The residential lot that both he and plaintiff's grandfather valued separately in February 2007 was declared to have a Fair market value of $1,200,000 holding a $375K mortgage. It was simply a dirt lot and required no maintenance. Plaintiff's grandfather had turned down an offer of $1,000,000 for it in January 2007.

22. Attorney Buckell was working on translating mortgage documents from a property in Costa Rica and had hired someone to send out a demand letter to the life Insurance company to pay on the minor children's father's multi-million life Insurance policy, held in an irrevocable Trust. He had sent out letters of administration to the court and stated that a Federal Tax would need to be paid.

23. Attorney Buckell had just retained C.P.A. Ed Mace to go down and meet with plaintiff's deceased father's business partners and perform valuations on every business partnership. He was planning on comparing them with the financial documents that plaintiff's mother had given him to make sure none had been overlooked.

24. The children's mother introduced attorney Georgia Hiller to plaintiff's grandfather around or about March 2007. Attorney Hiller's daughter was in the same class as one of the plaintiff's at Community School of Naples and had asked if she could be of any help to the children's mother regarding their father's estate.

25. Attorney Hiller met with the children's grandfather to discuss her ideas of bringing on several lawyers to individually value all the holdings, since the estate was so large. Attorney Hiller would oversee these attorneys and insure each one was properly administering the various assets.

26. Within days of Mr. Mace going down to do a full valuation on the business partnerships, plaintiff's grandfather fired attorney Buckell and decided to retain attorney Hiller to help him.

27. On the advice of attorney Hiller, plaintiff's grandfather first retained attorney Lorna Scharlachen in April 2007 to administer their father's estate. The children's mother retained her separately to collect the life insurance policy.

28. Attorney Scharlachen began by writing a letter to attorney Buckell disputing his fees. In her dispute letter, she claimed the children's grandfather had never intended to sell any of the

5

properties, a blatant lie, as he had already placed two on the market and turned down an offer of $1,000,000 only 4 months before. In addition, that particular property had been purchased with the intent of building a larger home for the family. After the father's death, those plans were scrapped and there was no reason to hold onto that property. It was simply a dirt lot with $800K in equity.

29. Attorney Hiller then introduced the children's grandfather to attorney Yale Freeman to discuss plans for a wrongful death suit.

30. Within weeks of attorney Hiller introducing and signing up these attorneys, attorney Hiller's husband passed away unexpectedly. Like the children's father, he was only 38 and the grief rendered her unable to assist in the matter anymore. Attorney Hiller had to resign, being incapable at the time of overseeing these attorneys to make sure the estate was being properly administered. She refunded her entire retainer.

31. Within a month, everything went to pieces. Attorney Scharlachen had no intention of working with anyone but plaintiff's grandfather. Various letters between her and attorney Freeman showdisagreements, until finally attorney Freeman resigned.

32. Attorney Scharlachen did everything she could to drive a wedge between plaintiff's grandfather and their mother. She refused to communicate with plaintiff's mother, despite the fact that the children's mother was also her client and had retained her to collect the life insurance policy.

33. Plaintiff's and their mother were the named and sole beneficiaries to their father's estate and the named and sole beneficiaries to the life insurance irrevocable trust set up by their father to collect the life insurance proceeds. Plaintiffs were all intended beneficiaries to each and every asset.

34. Despite working as the attorney for the estate for a year and a half, Ms. Scharlachen never once valued any of plaintiff's father's business partnerships, never sought buyouts for them, purposefully pushed properties into foreclosure, making no attempt to sell them, mixed up dates and seemed to be most interested in only communicating with plaintiff's guardian, their grandfather.

35. At the time plaintiff's grandfather petitioned to become the plaintiff's guardian, he failed to disclose that he held multiple conflicts of interest to two different sets of beneficiaries as trustee to a multi- million irrevocable trust in which the children and their mother were the sole beneficiaries, that he was the General Partner of the multi-million dollar Family Limited Partnership in which the children were limited partners and he held an interest, was custodian to all four children's custodial accounts, was the Personal Representative of the children's father's estate, held their mother's Power of attorney and was representative payee to the $50,000 per year the children received in Social Security Survivor benefits, all assets to which these children were beneficiaries and to which their grandfather had been their fiduciary for most of the children's lifetime. Plaintiff's grandfather also stated the children had zero assets, a deliberate lie.

36. In the beginning of June 2007, Attorney Scharlachen ceased all conversation to the children's mother, her other client. She had the children's grandfather stop paying all the mortgages on their properties with valued **equity** of over $1,000,000, nor did she make any effort to sell them. Just the opposite, she had the children's grandfather remove the listings.

37. Towards the end of June, she had the children's grandfather, a 74 year old man at the time, meet with her and sign a release of the children's father's medical records to the Life Insurance company. She never consulted with the children's mother, her "other" client, whom had retained her to collect that Life Insurance policy, was one of the beneficiaries to the policy as well as the

7

wife of the policyholder. She knew she had an ethical duty to advise her other client of her intent to release those records. Records that were the last thoughts and feelings of that client's husband and children's father.

38. Those particular records held Federal Protection under Federal Law CFR 42 (part 2) The one page release clearly states in big bold letters at the bottom that these records are protected under Federal Law 42 CFR part 2. The records held the highest protection in the country and while an Insurance Company is entitled to the objective part of the records, the subjective part, statements made in the records were unattainable and could only be seen with a release. No insurance company can condition paying the policy on the release of the subjective part under Federal Law. (Whyte v. Connecticut Mutual 1985) **"We understand Connecticut Mutual's difficult position, but we are bound by the express and unequivocal language of the regulations. The regulations are clear that only objective data may be disclosed,[16] and no waiver has occurred in this instance. Section 2.63 makes clear that waiver can occur only "[w]hen a patient in litigation offers testimony or other evidence pertaining to the content of his communications with a program".**

39. With no consultation with her other client, Ms. Scharlachen had the children's grandfather sign a release and then forwarded those records to the insurance company in their entirety. Never once looking at them. The release of those records resulted in the policy being denied two years later. The **sole** reason for denial after a two year investigation,  conflicting statements made in the **subjective** parts of those records.  Records any competent attorney who had taken the time to read the release would know could never be conditioned on the insurance company paying the policy.

40. Less than a month after being grossly negligent in turning over all the children's father's

protected medical records in their entirety to the insurance company, without ever once reading

them, Attorney Scharlachen terminated her representation with the children's mother. The letter

in part reads, **"The purpose of this letter is to inform you that in light of the conflict that has**

**arisen between you and your father, it is no longer possible for our firm to represent both**

**of you.**

41. A month later Attorney Scharlachen seeks out Attorney Cathy Reiman and on August 31,

2007, she sends attorney Reiman a letter. It begins, **"Pursuant to our conference scheduled for**

**August 31, 2007 please find enclosed for your review the following documentation"**....( all

private documents from her former client (plaintiff's mother) and her termination letter

referencing the conflict of interest between plaintiff's grandfather and mother. It ends," **I look**

**forward to working with you to resolve many of these issues."**

42. On September 4, 2007 a letter is sent to Mr. and Mrs. Albert M. Holtz from Attorney Cathy

Reiman. While the letter is addressed to Mr. and Mrs. Holtz, it begins, **"It was a pleasure to**

**meet with Al and Lorna (Scharlachen) on August 31, 2007.** It goes on to say, **"You have**

**requested whether there are claims that you may bring as guardian to any/all the life**

**insurance that may be paid to your daughter Meghan Soloff as a result of the death of her**

**husband, Jeremy M. Soloff and bring them on  behalf of your grandchildren as guardians.**

This is a complete breach of Ms. Scharlachen's ethical duty in not only seeking out an attorney to

sue her former client, but in actually procuring the other client's adversarial representation.

43. Even more egregious, once she terminated her representation with the children's mother, she

began accepting her fees from an out of state irrevocable trust. The sole beneficiaries to that trust

were the mother and her children. An irrevocable trust in which the children's mother was the

current beneficiary and which was titled in her name, the minor children were remaindermen

9

under the terms of the trust. Plaintiff's grandfather was the trustee, not a beneficiary. That irrevocable trust specifically states that legal fees may only be paid from that trust if the trust itself is in litigation. Not only was the trust not in litigation, but it was an out of state trust governed under the laws of Pennsylvania.

44. Prior to any decision being made whether the life insurance policy would be paid or not, a lawsuit was filed by Attorney Reiman in the name of plaintiffs, but without their knowledge, to collect those monies in lieu of the children's mother. The suit was meritless, with no legal precedence in Florida. Attorney Reiman never attempted to collect on the policy, sued before it was even paid out, placed it in jeopardy, had no court approval to file this suit on behalf of minor children and she alsotook her fees from the monies in the Pennsylvania Irrevocable Trust without court approval for those fees or approval from the court as to her rights to file that lawsuit on behalf of the minor children. A breach of her fiduciary duty.

45. In her filing Ms. Reiman destroyed the children's mother's reputation with untrue statements, causing the insurance company to petition the Federal Judge to allow that lawsuit into evidence to challenge the credibility of the children's mother, the main witness, years later. Ms. Reiman made no attempt to collect the policy. She was aware of the conflict of interest between the children's grandfather in his multiple conflicting fiduciary roles as trustee, general partner to a Family Limited Partnership (in which the children and mother had limited partnership interests) and custodian to the children's custodial accounts all held in Pennsylvania and in his Florida fiduciary roles as guardian to plaintiffs and personal representative of their father's estate. NEVER ONCE, did Ms. Reiman make the court aware of plaintiff's grandfather multiple conflicts of interests in two states, to two different sets of beneficiaries. Not only did she simply not care that she was legally required to report that to the court, but she too began accepting her

legal fees from the Pennsylvania trust without any court order allowing her to accept those fees on behalf of her clients as minor children. Never mind the fact that she was suing the named beneficiary of that trust, collecting legal fees prohibited by that trust, filing lawsuits in the name of minor children without court approval and never had her attorneys fees approved by any court. She not only racked up bills for a lawsuit that she had no legal right to file in Florida, but she placed that insurance policy in jeopardy by suing the insurance company before the policy was even paid out.

46. Plaintiff's grandfather claimed he brought this action on behalf of his grandchildren, stating, " the children were not named as beneficiary or co-beneficiary." In fact, these attorneys lied to plaintiff's grandfather. Plaintiffs were indeed named as beneficiaries. The life insurance was set up under an Irrevocable Trust to which the children **were** named beneficiary's.

47. In plaintiff's grandfather's June 2012 Pennsylvania deposition when asked what his right was to sue the children's mother for the life insurance replied that attorney Reiman had stated he should impose a **constructive trust around those monies.** The doctrine of constructive trust is well established in Florida Law and the courts will impose the same where" one through actual fraud, abuse of confidence reposed and accepted or through other questionable means gains something for himself which in equity and good confidence he should not be permitted to hold." Quinn .v Phipps, 93 Fla. 805, 113 So. 419, 422. What fraud did plaintiff's mother commit? What abuse of confidence or questionable means did their mother take to gain something for herself, that she should not be permitted to hold? The court should ask attorneys Reiman and Scharlachen if they used questionable means to obtain their legal fees from an out of state trust through fraud upon the court, that they should not be permitted to hold.

48. When asked in his Life Insurance deposition if plaintiff's grandfather thought the mother

would not provide for plaintiffs with these monies, their grandfather replied." No, I just was worried that in the event she remarried that the children might not get as much."

49. Plaintiff's mother had always been a stay at home mother, the life insurance and the Pennsylvania irrevocable trust were needed for her to continue to be a hands on mom, allow for plaintiffs the means of a good education, to have a home and their basic needs provided for in the event their father died. They were certainly not meant to be squandered on attorneys filing meritless lawsuits.

50. When the lawsuit arrived, with attorney Reiman suing plaintiffs mother in plaintiff's names, but without their approval, for the life insurance policy, their mother had no idea what to do. She had never been sued or sued anyone in her life. She had never been inside a courtroom, the only lawyers she had ever seen were the estate lawyers who drafted plaintiff's parents estate planning documents. Plaintiff's mother was penniless, having signed over every asset to their grandfather and her Power of Attorney at his request. He used that Power of Attorney to wipe out their mother's entire bank account in July 2007 at attorney Scharlachen's recommendation.

51. Plaintiff's mother was referred to attorney Mark Slack in September of 2007. Attorney Slack wanted to take over plaintiff's father's estate and obtain plaintiff's father's life insurance and was willing to take the cases on full contingency.

52. Since plaintiff's mother had signed over her appointment as Personal Representative of their father's estate to their grandfather, Attorney Slack, wanting to start administering the estate right away, contacted Attorney Reiman and stated he was would like to receive copies of all Attorney Reiman's documents, that he wished to take all the cases on contingency.

53. Attorney Reiman then attempted to blackmail Attorney Slack and plaintiff's mother stating the only way she would allow her client (plaintiff's grandfather) to release the Estate back to it's

rightful owners and drop her lawsuit against the life insurance company and plaintiff's mother was if Attorney Slack would have plaintiff's mother release her client (plaintiff's grandfather) from all liability in both Trust and Estate and have plaintiff's mother sign over all rights to the Pennsylvania irrevocable trust. A trust created for her and to which plaintiffs and their mother were the sole beneficiaries, over to the trustee (plaintiff's grandfather). Ms. Reiman seems to be forgetting that she was retained on behalf of plaintiff's as minor children and she had a fiduciary duty to act in plaintiff's best interest, not their grandfather's. She also seems to forget she has been receiving her legal fees illegally from these minor children's and their mother's irrevocable out of state trust. Releasing plaintiff's grandfather from all liability in his role as personal representative of plaintiff's father's estate and having their mother sign over an irrevocable trust to him, when he is not a beneficiary is not only illegal and unethical, but certainly a breach of fiduciary duty to her clients, all minor children at the time.

54. Ms. Reiman seemingly not caring that she is breaking multiple laws and breaching her fiduciary duties documents this in a letter to attorney Slack.

55. Somewhere along the line, attorney Reiman begins to intercede into all the assets belonging to plaintiff's and their mother. She now is apparently representing plaintiff's grandfather as de-facto personal representative of plaintiff's father's estate and as trustee to plaintiff's and their mother's out of state irrevocable trust. She is conveniently forgetting that the sole beneficiaries to all these assets are her "actual" clients, the minor children, along with their mother.

56. When Mr. Slack attempted to find out the true financial holdings in that irrevocable trust and requested an accounting, it was denied by Attorney Reiman to the current beneficiary (plaintiff's mother), who had never seen any documents whatsoever, on that trust in it's entire existence. Had Ms. Reiman checked Pennsylvania law she would have known that a trustee is

legally responsible to produce accountings to any beneficiary of an irrevocable trust who requests them.

57. Both Ms. Reiman and Ms. Scharlachen continued to cause unnecessary harm to the beneficiaries of all these assets by refusing to administer the estate, refusing to try and actually collect the life insurance and doing absolutely zero for the beneficiaries, unless plaintiff's mother signed a release.

58. They forced plaintiff's mother to participate in needless and unnecessary mediation, never intending to settle. This caused plaintiff's father's estate an even greater loss, as Attorney Slack could not attempt to begin collecting assets until he received their documentation and plaintiff's grandfather signed back over the personal representative title to plaintiff's mother..

59. Even more egregious, attorney Reiman placed plaintiff's mother in a classic Prisoner's dilemma. When plaintiff's mother fell apart after their father's death, plaintiff's grandfather filed to become their guardian. Plaintiff's mother entered treatment for depression and grief and successfully completed it. She wanted her children back. However, plaintiff's grandfather was in control of every penny she had. He had used the power of attorney plaintiff's mother had signed over to him and wiped out her bank account. He was trustee to the irrevocable trust and refusing to comply with the terms of the trust, he was personal representative of her husband's estate and plaintiff's mother did not have a penny to her name that was not controlled by plaintiff's grandfather who had a fiduciary duty to act in her best interests..

60. Throughout these "negotiations" it was made clear to plaintiff's mother by Ms. Reiman that if she did not release plaintiff's grandfather from liability and sign over various assets, she would not be getting her children back. Plaintiff's mother needed those assets to raise her children.

61. In April of 2008, the parties had reached an agreement that plaintiff's mother would sell the

14

real estate lot to Plaintiff's grandfather for $10 (it held $800,000 in equity) and in return

plaintiff's grandfather would return her children to her, turn back over the estate to her, withdraw

Ms. Reiman's meritless lawsuit and allow Mr. Slack to administer the estate and collect the life

insurance proceeds. Somewhere along the line Plaintiff's grandfather's attorney's forgot to

inform him that he was a fiduciary, that all the assets belonged to plaintiff's and their mother and

that he had no legal rights to any assets. The only asset he had was the guardianship of plaintiffs.

Ms. Reiman used plaintiff's as her trump card.

62. In April of 2008, She documented in a letter to Mr. Slack that plaintiff's grandfather was

returning plaintiff's to their mother and dissolving the guardianship. Plaintiff's were returned to

their mother in April of 2008.

63. In May of 2008, attorney Slack was typing up the settlement agreement mentioned above,

when he received a fax from Ms. Reiman. The fax stated that Ms. Reiman was adding a clause,

that if plaintiff's or their mother received any monies elsewhere, the 1994 irrevocable trust would

become null and void and revert to their grandfather. Plaintiff's grandfather was the trustee, not a

beneficiary. That would seem to be illegal. Attorney Slack advised his client not to sign the

settlement if that clause was included. When plaintiff's mother refused to sign the agreement,

plaintiff's grandfather who had only been releasing the  social security payments to plaintiff's

mother stopped all the payments and demanded plaintiff's be returned to him. He stated he

would call the police, as he had never "officially" revoked his guardianship. *there has been

some disagreement of these facts, plaintiff's grandfather stated he never added any clause. Either

he is lying or Ms. Reiman added that clause without his knowledge. The rest of the facts are

agreed upon.

64. After a year and a half of wasteful, time consuming negotiations when the only beneficiaries

to everything were the mother and her children and both attorney Reiman and attorney Scharlachen were being paid from the mother and children's irrevocable trust, while doing absolutely **nothing** to administer the estate or collect on the life insurance, Mr. Slack was forced to file with the court to have plaintiff's grandfather removed as Personal Representative of their father's estate. A petition he had filed months previously and pulled after Ms. Reiman's request that in the "spirit of negotiation" they try to resolve this without involving the court. A bad faith tactic by Ms. Reiman to prolong a mediation she had no intention of settling.

65. During this time, plaintiff's grandfather being represented "unofficially" by Ms. Reiman in lieu of her real clients, **the children,** was refusing to pay the mortgage on a piece of real estate. The Pine Ridge lot had been purchased by plaintiffs parents in November of 2005. It was valued by the original attorney of plaintiff's father's estate, Rob Buckell in February of 2007. In his memorandum he stated that he had valued the Pine Ridge lot at $1.2 million holding only a $375K mortgage.

66. Attorney Slack sent numerous letters to Ms. Reiman threatening her "de-facto" client with breach of fiduciary duty, if she did not take steps to prevent this property from falling into foreclosure.

67. The property was finally foreclosed on and set for sheriff's sale in September 2008. Plaintiff's mother managed to find a firesale buyer, but needed a release from plaintiff's grandfather as trustee holding the second mortgage to sell the property. Ms. Reiman once again breaches her fiduciary duty and documents in a letter to attorney Slack that plaintiff's grandfather will only release the second mortgage if plaintiff's mother agrees to release him from all liability and sign the 1994 trust over to plaintiff's grandfather.

68. Attorney Scharlachen, working together with attorney Reiman, then attempted to push the

16

children's father's estate through probate, valuing it at zero and with knowledge that attorney Slack wanted to pursue all actions on contingency for over a year. Mr. Slack was successful in thwarting their efforts and successful in having plaintiff's grandfather court-ordered removed as Personal Representative of the Estate of their father, Jeremy Maxwell Soloff in September 2008.

69. Both attorney Reiman and attorney Scharlachen appeared to defend plaintiff's grandfather. Why plaintiff's grandfather needed two attorneys to defend him is unknown. What is known is they were both paid their fees from an out of state Irrevocable Deed of Trust without court approval, lied throughout the proceedings, providing no evidence that backed up those claims and never sought court approval or made the beneficiaries aware that their trust was being used to fund all this litigation. The 1994 Meghan Ellen Holtz (Soloff) Irrevocable Trust Document specifically states that attorney's fees can only be taken from the trust, if the trust itself is in litigation. Furthermore, Ms. Reiman was retained by the children's guardian on their behalf and had a fiduciary duty to the children, not their guardian.

70. Attorneys Reiman and Sharlachen were unsuccessful defending plaintiff's grandfather and the court saw cause why plaintiff's grandfather should be removed and **not** be released from liability.

71. For over a year and a half, neither attorney Scharlachen nor attorney Reiman made any effort whatsoever, to value the estate, sell assets, pursue the life insurance, sell properties or do anything to administer that Estate. This caused all the estate's properties to fall into foreclosure, the business partnerships to lose their equity. What they did do is keep the only adult beneficiary poverty stricken, continue to receive their fees, from an out of state trust, illegally. An irrevocable trust, that paid their bills to sue the primary beneficiary and squander the children's father's estate. When the estate was turned over to plaintiff's mother the checking account was

17

zeroed out.

72. In June 2009, attorney Herman Russamanno(a past president of the Florida Bar) heard about plaintiff's mother's plight and came down from Miami to represent plaintiff's mother pro bono. He filed a petition for emergency relief from the Pennsylvania Trust for plaintiff's mother in Collier County. Ms. Reiman in yet another adversarial role to plaintiff's, showed up to represent plaintiff's grandfather. She countersued that plaintiff's grandfather be allowed to continue paying himself fees from the Pennsylvania Trust on behalf of the children. The accountings she presented to the court show that plaintiff's grandfather had removed $572,000 in cash from that trust in 2007, none which went to plaintiff's or their mother (plaintiff's suspect it went to pay Ms. Reiman). Furthermore, the accountings lacked any documentation. Additionally, plaintiff's grandfather was receiving the $50,000 per year that plaintiff's received from social security in survivor benefits. Plaintiff's grandfather had also accessed plaintiff's custodial accounts as custodian.

73. Judge Monaco's ruling stated that he could not order emergency relief, as it was indisputable that the trust was governed under the laws of Pennsylvania, he went on to deny Ms. Reiman's counter suit for child support fees stating, in the instant case, the present ability to pay and the amount of support has not been established, **let alone** whether the trust may be used as a source. Defendant's motion to authorize trustee to continue child support payments is denied.

74. Did that cause Ms. Reiman to tell Plaintiff's grandfather he needed to place those monies back in the Pennsylvania Trust? No, she simply sought out another attorney to cover up the wrongdoings.

75. Sometime in 2009, attorney Reiman, apparently realizing she has created a legal dilemma for herself seeing as the trustee has paid her legal fees from this trust, paid himself over $400,000

18

from that trust, ostensibly for the "needs" of his 4 young wards, has invaded his "wards"
custodial accounts and is spending the $50,000 per year in Social Security all without court
approval, so she seeks out attorney Tamara Nicola who becomes the third conspirator in this
legal drama. She has been retained as a guardianship attorney for plaintiff's grandfather. Not to
insure the children's interests, she has been tasked with getting the illegal fees that plaintiff's
grandfather paid to himself as guardian of plaintiffs from the Pennsylvania irrevocable trust
approved by a Florida Court, despite the fact that Judge Monaco's ruling clearly established that
it was a Pennsylvania Trust.

76. In early 2010 and within weeks of plaintiff's mother receiving a settlement from the life
insurance company, plaintiff's mother receives a notice in the mail that Ms. Nicola has filed for
grandparent visitation and a hearing has been set with Judge Brodie.

77. Plaintiff's mother arrives to the hearing pro se. Within minutes, Ms. Nicola has glossed over
grandparent visitation and has asked Judge Brodie to rule on plaintiff's grandfather's right to pay
himself child support fees from the Pennsylvania Trust. When Judge Brodie asks why she has
jurisdiction over a Pennsylvania trust, Ms. Nicola states that Judge Monaco has actually
established that the trust is a Florida trust. Ms. Nicola blatantly lied. What Judge Monaco's order
actually stated was that **it was indisputable that the trust was governed under the laws of
Pennsylvania, he went on to deny Ms. Reiman's counter suit for child support fees stating,
"in the instant case, the present ability to pay and the amount of support has not been
established, let alone whether the trust may be used as a source. Defendant's motion to
authorize trustee to continue child support payments is denied."**

78. Ms. Nicola knew very well that trust was governed under the laws of Pennsylvania and she
knew very well how Judge Monaco had ruled. Her intent was to deceive Judge Brodie. Her intent

19

is made very clear in an e-mail she sent to plaintiff's grandfather in November 2009, three

months before her hearing for "grandparent visitation" and six months after Judge Monaco had

made his ruling.

## TAMARA NICOLA E-MAIL TO LORNA SCHARLACHEN AND AL HOLTZ DATED NOVEMBER 1, 2009

You will probably need to add the trust as a party and sue the trustee (yourself). I will have to
come up with some **creative** ways of asking the Court to validate the payments already made on
behalf of the children from the trust.....I am going to discuss the pending lawsuits with Cathy
Reiman.

79. No doubt, Ms. Nicola is creative. She also blatantly lied to a Judge.

80. In March of 2011, plaintiff's mother files a pro se petition with the court to have the

children's father's Masarati returned to her. Plaintiff's grandfather had filed to have the vehicle

declared exempt from their father's estate and the court ordered plaintiff's grandfather to return it

to plaintiff's mother. Ms. Scharlachen stated plaintiff's grandfather had returned it when she

attempted to close out the estate. It was never returned, and plaintiff's grandfather continued to

drive it.

81. Rather than simply returning the vehicle to the rightful owner, Ms. Nicola filed a response

refusing to return the vehicle. Plaintiff's mother became frightened that this attorney would once

again attempt to deceive the court, so she retained her own attorney.

82. Once plaintiff's mother retained an attorney, the case was turned over to Ms. Reiman. In yet

another adversarial role to her "true" clients, **the children**, Ms. Reiman appears in court on

behalf of plaintiff's grandfather, states the statute of limitations has passed and declares

plaintiff's grandfather the legal owner of plaintiff's father's car. The court agrees with Ms.

Reiman. Plaintiff's grandfather then trades the children's father's vehicle in and receives $40,000

towards the new porsche he purchased for himself. Plaintiffs and their mother receive zero.

83. Ms. Nicola continues her onslaught by refusing to release plaintiff's guardianship back to their mother, despite the fact that plaintiff's are now living with their mother in California. She forces plaintiff's mother to retain and pay for a custody attorney. The custody attorney tells plaintiff's mother she will also need to retain a guardianship attorney because of all the illegal expenditures made on behalf of her children.

84. With the life insurance trust monies dwindling, the mother had to stop the hemorrhaging of attorneys fees. Plaintiffs and their mother had fled to California in hopes that these attorneys would stop. That did not stop them.

85. In January of 2012, attorney Lance Mckinney who had been retained by plaintiff's mother filed a demand for an accounting and an action for surcharge for breach of fiduciary duty against plaintiff's grandfather. The filing states that the guardians of the children's property, have **failed to file with the court an Initial Verified Inventory and Annual Accountings of the funds they have received since the inception of the guardianship, pursuant to F.S. 744.367 and 744.3678**. It further states, the guardians have received funds for the minor children by taking funds from an Irrevocable Deed of Trust for Meghan Ellen Holtz (now Soloff), dated December 6, 1994. The guardians claim they have no assets as guardian of the children's property, however, after reviewing an accounting of the Irrevocable Deed of Trust, which Albert M. Holtz is the trustee of said trust, the accountings show payments made to (individual) accounts for and on behalf of each child, as well as children's withdrawals. In addition, the guardians received social security benefits on behalf of each child. *That accounting request was **denied** by the court. [ A plenary guardian in Florida is vested with the exclusive power to manage and administer the Ward's property. This power is balanced, and the potential for abuse safeguarded, by an

21

obligation on the part of the guardian to account for his/her financial activities. Fla. Stat. 744.3678]

86. In March of 2012, a motion to consolidate the cases is filed. It in part reads, "the issues in the guardianship, the estate and the family law cases overlap in multiple ways, including but not limited to, the need for investigation and review of the financial transactions between and on behalf of the parties and the minor children to now abjudicate the parties and the children's rights and obligations to one another. Ms. Nicola and Ms. Reiman are listed as attorneys for plaintiff's grandfather.

87. Yet again, Ms. Reiman has taken on an adversarial role to her "true" clients, the children. She has now interceded in filing a meritless lawsuit for the life insurance, unsuccessfully attempted to get plaintiff's grandfather released from liability as Personal Representative to plaintiff's father's estate, taken legal fees from plaintiff's and their mother's irrevocable trust without court approval, defended plaintiff's grandfather in stealing their deceased father's car and now she has stepped in to co-defend him in his multiple breaches of fiduciary duty in his role as guardian. **"Any attorney representing an alleged incapacitated person may not serve as guardian of the alleged incapacitated person or as counsel for the guardian of the alleged incapacitated person or the petitioner." § 744.331(2)(c), Fla. Stat. (2009).**

88. In March of 2013, Ms. Nicola files her final lawsuit. This time Ms. Nicola has hatched a truly egregious action. She now has plaintiffs (being minor children and residing in California with their mother) named as parties with their grandfather. She is seeking to invade the life insurance irrevocable trust, (the sole monies plaintiff's mother managed to salvage to support them) and is requesting a "new" judge allow plaintiff's grandfather to invade that trust to pay back the legal fees that plaintiff's grandfather  illegally paid these attorney's from the Pennsylvania irrevocable trust. The only beneficiaries to both trusts, the children and their mother. The only difference,

plaintiff's mother is trustee to the life insurance trust, where plaintiff's grandfather is trustee to the Pennsylvania Trust. Neither, Ms. Nicola or Ms. Reiman ever bother to request a guardian ad litem be appointed for the plaintiffs as minor children. That might highlight their wrongdoing and criminal acts.

89. The "new" judge that was appointed was Judge Christine Greider. Plaintiffs found it strange that a Judge would allow a lawsuit to be filed against their mother, where Ms. Nicola has named the children as plaintiffs with their grandfather, when the children are living with their mother and unbeknownst to them, suing their mother to invade the only monies their mother has to support them, to pay back legal fees illegally taken from an out of state trust that were used to sue their mother (the named beneficiary of that trust) on plaintiff's behalf when it has already been established that trust is governed under the laws of Pennsylvania.

90. They have divided up the sole beneficiaries to both trusts and named the children as plaintiffs suing their mother to invade one trust in which they are named beneficiaries to pay back their other trust for legal fees illegally paid to all these attorneys who have pillaged all their other assets and the Judge never questions if a guardian ad litem is needed. That seems to be somewhat unethical, if not illegal.

91. In November of 2014, plaintiff's mother becomes genuinely fearful that these attorneys will strip her and her children of every last dime. She files a pro se petition alleging the facts above and including all the documents she had never been able to show to the court (having never received an evidentiary hearing.) Plaintiff's mother is also requesting an attorney be appointed to independently represent her minor children. The lawsuit is filed and docketed by the Collier County Clerk of Court.

92. Within a day of that lawsuit being filed someone in the court system has alerted Ms. Nicola

about the lawsuit plaintiff's mother has filed. She sends a threatening e-mail to plaintiff's mother that if plaintiff's mother does not pull her lawsuit that she will file for sanctions against her for frivolous and scandalous accusations. Plaintiff's mother's petition was certainly scandalous, the actions of these three attorneys are nothing but scandalous, but frivolous when these attorneys have left a clear evidentiary path and plaintiff's as a matter of law, were required to have someone without a conflict of interest to represent their best interests being minor children, why would Ms. Nicola think that action was frivolous, unless of course appointing someone to actually represent the best interests of minor children would finally bring her wrongdoings to the attention of the Court..

93. Plaintiff's mother refused to pull her petition. She then contacted a few attorneys who cannot find her petition, nor the seven years of public records in the Collier County Court public record system. Someone has apparently pulled all the public records, along with her petition and hidden them.

94. Plaintiff's mother decides to contact the head judge and alert him that someone has illegally pulled all the public records pertaining to her case, along with her lawsuit. When she pulls up that Judge's bio she finds that he is married to attorney Cathy Reiman. They apparently use different names. He goes by Judge Rosman and she goes by Reiman. Even more strange, the attorney that Plaintiff's mother retained in the guardianship matter asked for a review of those accountings. The Court denied him that request. One of the Judge's that has been copied on that request, Judge Rosman. Is it not fraud upon the court to allow plaintiff's grandfather to circumvent the law in Florida and not be required to file any annual accountings or a verified initial inventory because Ms. Reiman's husband happens to be the head Judge?

95. The purpose of the guardianship statutes is protecting the rights of incapacitated people and

managing their financial resources. That can only happen through a review of the guardian's conduct. The court should be greatly disturbed by the actions of plaintiff's guardian and the attorney's (defendant's) who assisted him. Defendant's actions are unacceptable, reprehensible and "inapposite to the fiduciary and statutory duties they are required to uphold as officers of the court." By allowing plaintiff's grandfather to place assets outside the protection of the Court and the law, and to deny access to those assets to plaintiff's mother as an interested person, while steadfastly refusing to request that plaintiff's be appointed an independent guardian ad litem is unconscionable and resulted in a "systematic and purposeful looting of all the children's assets.."

96. Plaintiff's mother became fearful for her and her children's safety at that point. There was a serious concern over corruption and her physical safety if she returned to Florida.

97. Ms. Nicola had no such concerns, she continued her course of destruction over the children's assets and had a hearing with Judge Greider set for June of 2014.

98. Since, Ms. Nicola was attempting to invade the only monies the mother had been able to salvage to support her children, Judge Greider and Ms. Nicola had a seemingly cordial relationship, Ms. Reiman's husband was Head Judge and someone amongst them had pulled those records, plaintiff's mother then went and wrote a three page letter to three Judges in Collier County and every single member of the Florida Bar. Plaintiff's mother overnighted the letter and included her petition that had gone "missing." Within 24 hours, Ms. Nicola had the upcoming hearing terminated and requested the entire case be closed.

99. Plaintiff's mother turned over all these documents to her eldest daughter right before plaintiff left for her freshman year in college in August 2016. Plaintiff's mother stated that she could no longer emotionally handle fighting these corrupt attorneys. She had been forced to seek psychiatric counseling as a direct result of these attorney's wrongdoings five years prior and was

25

still not in a place where she felt she could become involved any further in the matter. However plaintiff's mother did not want to extinquish her children's claims without allowing plaintiff's the opportunity to review the documents and make an informed decision as to whether or not we chose to pursue claims in our own right.

100. Seeing how, Defendants actions led to the loss of plaintiff's homes, all their personal belongings, forced them to be pulled from the only school they had ever known, caused severe economic hardship to them, deprived plaintiff's of being able to reside with their mother for years and have caused severe emotional harm all while circumventing the laws these defendants were required to follow at a time when plaintiff's were all minor children, plaintiff's decided they did indeed want to pursue their claims. At various times, plaintiffs have been homeless, without health insurance and without funds to cover even their most basic needs. No words can do justice to the harm these attorney's inflicted on plaintiff's who were all vulnerable children at the time.

## STATEMENTS, DOCUMENTS AND E-MAILS IN SUPPORT OF PRELIMINARY

### FACTUAL ALLEGATIONS

### PENNSYLVANIA DEPOSITION OF ALBERT M. HOLTZ JUNE 2012

**Question (Attorney Patberg):** Are you paying lawyers from the trust of Meghan Ellen Holtz to prosecute claims against her? **Answer(Albert Holtz):** No  **Question (Attorney Patberg):** You have never done that, ever? **Answer(Albert M. Holtz):** No, no that's all my expense, yeah. **Question(Attorney Patberg):** You have never paid Cathy Reiman out of the Meghan Ellen Holtz Trust? **Answer(Albert M. Holtz):** Oh, yeah with that one exception in the beginning with Cathy Reiman. **Question(Attorney Patberg):** So, she sued on your behalf. On the estate's behalf she sued your daughter, right? **Answer(Albert Holtz):**Yes. **Question(Attorney Patberg):** And then when she was suing your daughter you paid her out of the trust to sue your daughter, isn't that true? **Answer(Albert Holtz):** Yes, Yes. **Question(Attorney Patberg):** Did you ever disclose to Meghan Soloff that you were paying a lawyer out of her trust to sue her, did you ever disclose that prior to this litigation? **Answer(Albert Holtz):** No, I don't think so.

### E-MAIL FROM ATTORNEY CATHY REIMAN TO ALBERT M. HOLTZ 2009:

The attorney from the insurance company called me and asked me what we wanted to do. He told me that if we do not drop the case, he is going to assert in the new Federal Suit filed in Ft. Myers by Meghan's new counsel that the new case should be dropped and litigated in the existing state court case. As I told you previously, I do not want to be in a position where Meghan can accuse us in anyway of interfering with her claims. As such, I recommend that we dismiss it without prejudice at this time (that means we can refile it later) The attorney for the insurance company told me it will be some time before the case is resolved (which I fully expect) and as such, we can intervene in the Federal Court action at the appropriate time, down the road, if it appears money will be paid.

## LINCOLN FINANCIAL DEPOSITION OF ALBERT M. HOLTZ 2010

**Question:** (Robbins) Do you have any idea as to why Lincoln Financial denied  Meghan's claim for benefits under the policy? **Answer:** (Holtz) No, I'm not really up to date on that, I don't think. No, I really don't. **Question:** You have no understanding, whatsoever as to why Lincoln Financial didn't pay Meghan? **Answer:** I can only assume, but I have no understanding of why they're not paying Meghan, yeah. I it's been a long time. I would hope they had, but no I don't. **Question:** Okay. **Answer:**yeah **Question:** Okay. ( The sole reason for denial of these benefits were Albert M. Holtz and his attorney Lorna Scharlachen's releasing Federally Protected medical records. The Federal Protection the records held was clearly stated at the bottom of the release) So , the..how many different lawsuits, as we sit here today, are pending between you and Meghan? I'm not talking about the lawsuit you are being deposed in right now, but it looks like there were Florida Suits and a Pennsylvania suit....

## CATHY REIMAN LETTER TO MARK SLACK DATED NOVEMBER 30, 2007

"You have stated that Meghan wants to control this litigation and that you are willing to handle these cases on a contingency basis. Mr. Holtz is willing to resign as personal representative in favor of Meghan so that she can retain you for this purpose **provided** that he receives a full and complete discharge from any liability for his actions as personal representative..... If not, Mr. Holtz will attempt to locate counsel to undertake these cases on a contingency basis. If he is unable to find counsel to do so, which is a serious concern, he will seek to close the estate without further action......

## 2012 PENNSYLVANIA DEPOSITION OF ALBERT M.HOLTZ

**Question(Attorney Patberg):** Have you ever during the course of your administration of the trust for Meghan Ellen Holtz ever refused to provide her an accounting when requested to do so? **Answer(Albert M. Holtz):** Not that I'm aware.

## LETTER FROM ATTORNEY CATHY REIMAN TO ATTORNEY MARK SLACK: NOVEMBER 10, 2007

Dear Mark:

As to the irrevocable trust and your demand for an accounting, your demand is **rejected.**

## ATTORNEY MARK SLACK LETTER TO ATTORNEY CATHY REIMAN DATED DECEMBER 20, 2007

Re: Albert M. Holtz and Mildred B. Holtz v. Meghan Soloff and the Lincoln National Life Insurance Company.

Dear Cathy:

As you know, I met with Meghan Soloff on December 19, 2007. I know we spoke earlier that day and you indicated to me that it was your understanding that Mrs. Soloff had reached an agreement on several matters with her father, Albert M. Holtz. After meeting with Mrs. Soloff, I realize that was not her understanding.

Regardless, we continue to run into the major obstacle, which is Mr. Holtz's **refusal to account** for and distribute income from the Irrevocable Deed of Trust for Meghan Ellen Holtz dated December 6, 1994. I cannot, nor can any other attorney that is representing his client in an appropriate fashion, recommend that Mrs. Soloff enter into any agreement with her father, until such time as there has been a full accounting of the activities of Mr. Holtz with regard to the assets of the Irrevocable Deed of Trust for Meghan Ellen Holtz.

Additionally, the money that was used to purchase that Pine Ridge property came from the assets of that trust, which belongs to Mrs. Soloff. If Mr. Holtz allows the property to go into foreclosure by failing to utilize the assets of the trust to either payoff the first Fifth Third Loan or bring the mortgage up to date, he will be held liable for his actions.

Mark Slack

## PENNSYLVANIA LITIGATION DEPOSITION ALBERT M. HOLTZ 2012

**Question:** Did you ever refuse to release the mortgage to allow for a sale by Meghan of the Mahagony Road property. **Answer:** No. **Question:** Never? **Answer:** No **Question:** Did any of your lawyers ever refuse on your behalf that you're aware of? **Answer:** No, not that I'm aware of. Obviously, to sell it, we had to release it. We would have to release that in order for her to be able to sell it.

## CATHY REIMAN LETTER TO MARK SLACK DATED AUGUST 6, 2008

Re:   Soloff – Sale of Pine Ridge Property.

Dear Mark:

I have conferred with my client, who as you know holds a substantial second mortgage on the property in his capacity as **trustee**. He is willing to execute a release of this mortgage without receiving any of the proceeds on the following terms and conditions.

1. Meghan will execute a full and complete release of all claims against her father and mother, individually and in all fiduciary capacities;

2. Meghan will stipulate to her father's discharge as personal representative, including a court order that he is released from all liability, and will withdraw her petition to have him removed

3. Meghan will stipulate that the release of the mortgage in it's entirety is a settlement of disputed claims and that she will waive the right, **if any,** to any interests in the trust, including, but not limited to accountings and further distributions.

4. Meghan will file the 2006 income tax return that has already been prepared for her signature and pay from the proceeds of the sale the outstanding liability owed to the I.R.S.

Cathy Reiman

## RE: ALBERT AND MILDRED HOLTZ  V, MEGHAN SOLOFF, et al. RELEASE OF PINE RIDGE PROPERTY

Dear Cathy,

I am in receipt of your letter of August 6th, 2008. Your conditions are unacceptable. Demand is now made that Albert M. Holtz as Trustee of the irrevocable Deed of Trust Dated December 6th, 1994, execute a release, releasing the property from the mortgage on the property known as lot 8, Block J, Pine Ridge Extension, Naples, Florida. Your client's refusal to release the property would be inexcusable, and would cause further damage and hardship to the beneficiary of this trust, Meghan Soloff....

  Mark Slack

## PENNSYLVANIA LITIGATION DEPOSITION ALBERT M. HOLTZ  2012

**Question:** During this period of time were any of the (children's) custodial accounts accessed for their care and maintenance? **Answer:** Yes. **Question:**Do you have an estimation of how much each child's custodial account was accessed? **Answer:** I'm sorry repeat that. **Question:** Sure, fair enough. You indicated that the children's custodial accounts had been accessed, if I understood you correctly? **Answer:** Correct. **Question:** For each child, do you know how much money was withdrawn? **Answer:** Well, let's see, that I'm not exactly sure of because it was used for **education** and also used for medical.

So, I would have to go back and add those numbers up.

## 2010 LINCOLN FINANCIAL DEPOSITION: STATEMENT OF ALBERT M. HOLTZ

As a matter of fact I went overboard. I picked up numerous expenses, **including private school for four years.**

## THE ACCOUNTING'S MR. HOLTZ PRESENTED TO THE PENNSYLVANIA COURT SHOW THE 1994 TRUST PICKED UP ALL PLAINTIFF'S PRIVATE SCHOOL EXPENSES. THUS:

1.  In 2010, Plaintiff's grandfather states he paid all of plaintiff's private school from his own funds.
2.  In 2011, Plaintiff's grandfather's accounting's on the 1994 Trust show that the trust paid those school funds.
3.  In 2012, Plaintiff's grandfather states he paid those funds from plaintiff's custodial accounts.

## ALBERT M. HOLTZ E-MAIL TO EDWARD AUFMAN  NOVEMBER 22,  2009

I purchased a Land Rover on Saturday. I will have a $1000.00 a month for 36 months to pay off the balance. Thus I would assess each of the children's accounts $250.00 each and send in to Land Rover. I plan to assess Meghan $10,000.00 out of the Trust as her fair portion.

## 2010 HEARING TRANSCRIPT IN FLORIDA: JUDGE BRODIE

**Ms. Nicola:** There was not $500,000  spent for the children. **Respondant:** (Meghan Soloff ) $410,000. **Ms. Nicola:** There was not $410,000.... Ms. Nicola might want to check with her client (who happened to be standing right next to her during this hearing.)

## PENNSYLVANIA DEPOSITION OF ALBERT M.HOLTZ 2012

**Question:** (Attorney Patberg) According to Exhibit 7, You had taken $410,284 from her trust for

distribution to her children, is that correct? **Albert M. Holtz** Where is that number. **Question:** Right here, sir.**Defendant:** Actual distributions, okay, uh-huh. Well, yeah, okay.

## 2009 FLORIDA HEARING TRANSCRIPT: JUDGE MONACO

**Attorney Cathy Reiman on behalf of Albert M. Holtz:** And during the almost three years that you had full time custody of the children has your daughter provided any financial assistance?**Answer:** (Holtz) No. None, Ms. Reiman.

## 2009 HEARING TRANSCRIPT IN FLORIDA : JUDGE MONACO

**Statement by attorney Cathy Reiman on behalf of Albert M. Holtz:** And it is a trust created in Pennsylvania and controlled by Pennsylvania law.

## E-MAIL FROM ATTORNEY NICOLA TO ALBERT HOLTZ AND LORNA SCHARLACHEN DATED NOVEMBER 1, 2009

Lorna and I discussed the following...I am going to discuss with Cathy Reiman, the pending lawsuits... I believe you need to take the following action: File a Petition with the court to establish child support and to request that the court allow you to invade the Trust. The trust should be included as a party to the litigation. In this regard, you will probably need to add the trust as a party and serve the trustee (yourself). I will have to come up with some **creative** way of asking the court to validate the payments **already made** on behalf of the children from the trust.

## 2010 HEARING TRANSCRIPT IN FLORIDA : JUDGE BRODIE

**Attorney Nicola for Albert M.Holtz: The Court:** Now, why do I have jurisdiction over this matter when there's a Pennsylvania trust? **Ms. Nicola:** The reason is, Your Honor, that---and I got a copy of this order from Judge Monaco. Let's see here. Which the orders at----let's see here---12 and 13. The trust is actually in Florida even though it was established in Pennsylvania, so the funds are here.

## RULING BY JUDGE MONACO JUNE 2009

1. It is indisputable that the trust is **governed under the laws of Pennsylvania.**
4. In the instant case, the present ability to pay and the and the amount of support has not been established, **let alone whether the trust may be used as a source.**

**HEARING TRANSCRIPT 2009 (JUDGE MONACO)**

"and this trust that was created for her has done everything against her, down to paying legal fees to be used against her, that's a first, in 34 years of legal practice, I've never heard of that fact pattern happening before.."

-Herman Russamanno (Past President of the Florida Bar) representing Meghan Soloff Pro Bono

**PENNSYLVANIA DEPOSITION OF ALBERT M. HOLTZ 2012**

**Defendant:** (Albert M. Holtz) No. **Question:** (Attorney Patberg) you have never done that ever. **Defendant:** No, No that's all my expense, yeah. **Question:** You have not paid Cathy Reiman out of the Meghan Ellen Holtz Trust?**Defendant:** Oh yeah, with that one exception in the beginning, yes. She was brought in on a number of things to handle proactively for the trust and she was being paid for that because it was on **behalf** of the trust. There is a payment to your lawyer on January 29, 2008, from the Trust. Did you pay $10,311.97 to Cathy Reiman, Roetzel and Andress for purposes of litigating against Meghan Soloff? **Defendant:** I don't know what is in here, the back up on all of this. **Question:** The only way we'd know this is if we had the legal bills, right?**Defendant:** Yes, I guess so, yeah. (Cathy Reiman redacted all her legal bills, claiming attorney /client privilege)

**Question:** What do you believe your legal rights were to do that? (sue Plaintiff's mother for the life insurance proceeds) **Defendant** My legal right was based on legal research Cathy did. It was called a constructive trust. You would have to ask her, she is the lawyer. **Question:** Just so I'm clear on this. She does research to determine whether or not at least some of the insurance proceeds can be taken from Meghan and put in a constructive trust and Meghan's trust pays her attorney bills, do I have that right?**Defendant:** Yes. **Question:** you don't see a problem with trying to take money from that....**Defendant:** Well....

**Question:** I understood earlier in your deposition you had indicated Reiman was doing work on behalf of the Trust.**Defendant:** She did some work on behalf of the Trust, yes. **Question:** I don't see or maybe I'm wrong, I don't see the trust even mentioned in her engagement letter?**Defendant:** No, it was not in the engagement letter.

**ENGAGEMENT LETTER FROM CATHY REIMAN TO ALBERT AND MILDRED B. HOLTZ DATED SEPTEMBER 4, 2007:**

Dear Mr. and Mrs. Holtz:

It was a pleasure to meet with **Al and Lorna** on August 31ˢᵗ, 2007. The purpose of this letter is to outline the terms of our engagement. You have requested that we appear on your behalf as

co-guardians in the pending proceedings regarding your grandchildren. Additionally you have requested that we research whether there are claims you may bring as guardian's to any or all of the life insurance that may be paid to your daughter, Meghan Soloff, as a result of the death of her husband, Jeremy M. Soloff, and in the event there are claims available, to bring them for the protection and benefit of your grandchildren.....

## PENNSYLVANIA DEPOSITION OF ALBERT M. HOLTZ 2012

**Question:** You paid more than $35,000 that was taken from the trust to pay Cathy, is that your testimony?**Defendant:** $35,000 for who? **Question:** $35,000 based on the exhibits I showed you.**Defendant:** $35,000 is not for Cathy. You still have $35,000 for Cathy? **Question:** Right, the trust paid approximately $35,000 to Cathy.**Defendant:** Let me see that. That does not sound right. Can I take a look at that. **Question:** For the record it is $10,311, $2,687, $3,655, $2,476, $5,000 retainer and $12,696. **Defendant:** The one is not here for Scharlachen, you aren't counting that? **Question:** I'm not counting Scharlachen. The trust paid her about $40,000.

**Question** (Attorney Patberg): Scharlachen terminated the attorney/client relationship with your daughter, Meghan Soloff, isn't that true. **Petitioner:**Yes. **Question:** Did you ever pay her with your own monies? **Answer:** No, no it was all estate related, yes. **Question:** All related to Jeremy's estate?
**Answer:** Yes.

## E-MAIL FROM EDWARD AUFMAN TO ALBERT M. HOLTZ DATED JANUARY 2, 2007

As of today's date the trust is valued at **$1,595,000**

## 2009 HEARING TRANSCRIPT : JUDGE MONACO

"this is the farthest thing from any accountability and, you know, mischaracterizations. Accounting terms unheard of in a courtroom with regard to how money is classified. Are there receipts? Where do they exist? It's hard to even comprehend that."

"this is nothing but a backdoor effort to revoke a trust that is irrevocable."

- **Herman Russomanno (Past President of the Florida Bar)**

## PENNSYLVANIA DEPOSITION EDWARD AUFMAN (FINANCIAL ADVISER)  JUNE 2012

**Question (Attorney Patberg):** Do you have any idea of the value of the Irrevocable Deed of Trust as of today's date? **Answer : (Mr. Aufman)** I believe it is less than **$122,000.**

## FIRST CAUSE OF ACTION
## ( DECLARATORY RELIEF )

100. The oldest plaintiff in this action is 19 years old and has spent the better part of her

freshman year in college preparing a federal complaint to protect her and her younger brother's

interests and claims because attorneys the children should have been able to trust to follow the

law, instead preyed on them and sought to have their constitutional rights extinguished by fancy

legal maneuverings. Each of these lawyers involved in this misconduct knew very well what they

were doing was improper, illegal and unethical. They followed no laws, sought no court orders,

attempted to deceive the court, depleted and misappropriated funds and ruined assets needed to

insure the welfare of minor children. They filed malicious lawsuits without court approval, took

their fees without court approval and never once sought out a guardian ad litem to insure

statutory duties were followed as they were required to do as officers of the courts. Their services

did not provide any benefit WHATSOEVER, to the minor children. Section 744.108(1), Florida

Statutes (2010), provides that "an attorney who has rendered services to the ward or to the

guardian on the ward's behalf, is entitled to a reasonable fee for services rendered and

reimbursement for costs incurred on behalf of the ward." However, an attorney's entitlement to

payment of reasonable fees and costs is subject to the limitation that his or her services **must**

**benefit** the ward or the ward's estate. King v. Fergeson, Skipper, Shaw, Keyser, Baron, &

Tirabassi, P.A., 862 So. 2d 873, 874 (Fla. 2d DCA 2003) (Villanti, J., concurring specially);

Butler v. Guardianship of Peacock, 898 So. 2d 1139, 1141 (Fla. 5th DCA 2005).

101. The harm is compounded when one looks at the vulnerability of the plaintiffs and the

**34**

systematic failure of defendants to adhere to any fiduciary or legal duties, seek any court

approval for their actions, comply with the terms of trusts and wills, and their wanton failure to

take into consideration the needs of plaintiffs as minor children nor include the plaintiffs as

parties (except when it was in their best interest). These defaults resulted in litigation in two

different states which increased the cost to the plaintiffs of attempting to secure their rights, and

delayed any redress.

102. As Judge Manalich wrote, " **The parties in this case appear to have a long and tragic**

**litigation history involving Florida and out of State Federal and State court**

**proceedings....it also appears that there is ongoing litigation between the parties in**

**Pennsylvania regarding trust funds." Judge Manalich (2010)**

103. Because none of these actions were blessed by a court in a proceeding in which the minors

had been independently represented by a guardian ad litem, any proceedings are invalid-and

non-binding-as a matter of law. The acceptance of funds offered in settlement of a minor's claim

using an arrangement that circumvents the proper legal procedures may result in personal

liability of the plaintiff's counsel,restoration of funds improperly paid to the attorney, and legal

malpractice liability.

104. Furthermore, notice of judicial proceedings must be reasonably calculated to reach those

known to be affected by such proceedings. Before the court could discharge the children's

guardians and approvetheir accounting's, all beneficiaries were required to receive notice and

have an opportunity to be heard before they were deprived of their property or any claims they

may have had against their guardians and the attorneys who represented them. In this case, the

guardians held multiple conflicts of interest and had interests that were adverse to the wards.

When the court failed to appoint a guardian ad litem, it not only allowed plaintiff's guardian's to

35

circumvent Florida Law by never filing an Initial Verified Inventory and Annual Accountings of the funds they received since the inception of the guardianship, pursuant to F.S. 744.367 and 744.3678 but it prevented them from pursuing claims against these attorneys and violated their rights of Due Process under the 14th amendment to the Constitution.

105. When Judge Greider was informed that the guardian's had lied to the court stating the children had no assets, when accounting's filed by their guardian in Pennsylvania showed that not only did each child have individual custodial accounts, that their guardian had removed in excess of $400,000 from an irrevocable trust on behalf of the children as beneficiaries, paid legal fees from that out of state irrevocable trust to these Florida attorney's and had received $50,000 per year as representative payee to the children's social security survivor benefits , Judge Greider denied a review of those accountings.

106. Under normal circumstances, property holders are directly aware of legal proceedings regarding their property, either directly or through a guardian, trustee or personal representative. In this case, the guardian, trustee and personal representative to all their assets was the same person and held multiple conflicts of interests to two different sets of beneficiaries in two different states.

107.When the children's guardian's attorneys failed to disclose these conflicts of interests to the Florida Court, they prevented the Florida Court from being able to appoint a guardian ad litem to protect the children's assets. As a result, the court was prevented from following statutory requirements and cut off the minor children's rights to have the guardian and his attorneys answer for negligent or illegal impairments of their interests. Interests which were diminished through the filing of multiple lawsuits in the children's names without court approval, allowance

36

of improper legal fees without court approval and improper fees paid to their guardian who, in the children's names but without their knowledge removed hundreds of thousands of dollars on behalf of these minor children, by way of out of state fiduciary accounts.

108. Defendants simply assumed they could do whatever they liked and wait for the beneficiaries to come after them.

109. Since, no court ever approved those legal fees, when plaintiff's mother sued for an accounting in Pennsylvania, Ms. Reiman and Ms. Nicola attempted to get those legal fees approved by a Florida Court before it came to the attention of the Pennsylvania Court.

110. When they filed a lawsuit in Florida in which they named the minor children as parties with their guardian, suing plaintiffs mother to invade the life insurance irrevocable trust (the only monies the mother had left to support these children) to pay back the 1994 trust for all the legal fees it illegally expended to launch these meritless litigations and never appointed a guardian ad litem, due process was denied to the minor children.

111. Defendants cannot use the children's interests as a way to divert huge sums of monies from this trust without any court order, accountings or verified initial inventory filed, file lawsuits in the children's names without court approval, allow plaintiff's trust to pay their legal fees without any court approval and then prevent plaintiffs from challenging the constitutional deprivation of their property by including plaintiffs as parties with their guardian while failing to inform the court their guardian had multiple conflicts of interests and was working adversely to plaintiff's best interests, thereby insuring no guardian ad litem was appointed.

112. Not only were plaintiffs named as parties with their guardian, not appointed a guardian ad litem, but they were suing their mother, the only other beneficiary for assets that belonged solely

37

to the children and their mother. Their mother was forced to proceed Pro Se, insuring that plaintiffs not only had adversarial representation, but illegal and inadequate representation.

113. It has further been acknowledged that plaintiffs custodial accounts were co-mingled with this trust and accessed during this time period. Accounts that should not have needed to be accessed when the 1994 trust held $1.6 million during that same time period. This Trust was also co-mingled with assets in plaintiff's father's estate which resulted in a devastating loss of all their fathers estate. An estate to which plaintiffs were also beneficiaries.

114. The conflicts of interests of plaintiff's guardian and the illegal distributions from the 1994 trust led to litigations in both Pennsylvania and Florida. Defendants accepted funds from the 1994 trust to defend plaintiff's guardian in his conflicting role as Personal representative of the children's father's estate. Ms. Scharlachen and Ms. Reiman both redacted their legal billings to the Pennsylvania Court, but this court should know that they unsuccessfully defended plaintiff's guardian who was removed as Personal representative of their father's estate by court order, not released from personal liability and paid those attorneys in Florida from that 1994 Trust to defend plaintiff's guardian in that litigation.

115. Despite the clear economic devastation of all the children's assets, the children have never once received proper notice of their interests in any probate proceeding and no guardian ad litem has ever been appointed to represent their separate and distinct interests in all the Florida proceedings.

116. Plaintiffs clearly had a vested interest in those proceedings as they were named beneficiaries to all their father's assets. The rights of plaintiffs and the importance of their vested interests are even more so, having lost their father and being of such young age. Special consideration should

be accorded to their interests in receiving a fair and impartial trial based on the merits of their case and truth. In Ms. Reiman's words, "Public policy clearly mandates that any resources that were available to provide support needed to be preserved for the children of Meghan Soloff." In plaintiff's words, "Public Policy does not allow Ms. Reiman to circumvent Florida Law and take attorney's fees to file meritless lawsuits."

117. The Florida Court never received Jurisdiction over plaintiffs as beneficiaries to their father's life insurance or their father's estate as they have never received proper notice that their interests were even at issue in the proceedings held in the Florida Courts.

118. Of even more concern is that as a matter of law, Plaintiffs are asserting issues directly contrary to those of their former guardian.

119. It is the duty of the Court to determine at the threshold not only the statutory safeguards but also to predict in advance that the representation will be adequate, that the same class or same interest will be treated alike in the decree.

120. The obvious adverse interest of plaintiffs guardian and the attorney's who represented him in getting these accountings approved that essentially ruined the children's father's estate, cost them a substantial part of their father's life insurance policy, emptied a multi-million dollar trust with no liability are evident.

121. Plaintiffs would point out that in the petition that resulted in their grandfather's appointment as their guardian it was recited that he had "no interest adverse" to any of his grandchildren and that his grandchildren had no assets. But the grounds of contest plaintiffs are alleging show that, as a matter of law, the plaintiffs have asserted issues that were directly contrary to the interests of their guardian

122. It was clearly improper to appoint as guardian one who inevitably is in an adverse position to the minors for whom he purports to act. While an adverse interest is a grounds for removing a guardian, plaintiffs were minor children and had no one to assert this fact on their behalf. Defendants are attorneys who holds themselves out as experts in guardianship, trust and estate Law. With that kind of expertise, it is difficult to believe not one of the defendant's would understand when a guardian ad litem would be needed for minor children. Ms. Scharlachen terminated plaintiff's mother's representation citing a conflict of interest between her and plaintiff's grandfather. She certainly understood the term, "conflict of interest."

a.) A court order that purports to award finality in an "in rem" proceeding will not bind the beneficiaries unless the beneficiary's interests were adequately protected in the proceeding that led to the order.

b.) Guardians are appointed to protect the interests of minors, not to defeat them.

"An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the actions and afford them or in the event of an incapacity, such as minor age and afford them an opportunity to present their objections." Milliken v Meyer, 311 U.S. 457: Grannis v Ordean, 234 U.S. 385; Priest v. Las Vegas, 26 U.S. 604: Roller v Holly U.S. 398. The notice must be of such nature as reasonably calculated, under all the circumstances.

c.) Probate administration requires constitutional requirements of due process.

The United States Supreme Court has now made it clear that blind labeling of probate proceedings as "in rem" does not satisfy constitutional requirements of due process. Those

requirements mandate that notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections is necessary to meet constitutional requirements ;(Mullane v. Central Hanover Tr. Co) (1950) 33 U.S. 306, 314 [94 L. Ed. 865,873, 70 S, Ct. 652].)

(1) The U.S Supreme Court's ruling on Mullane had modified security, and that the failure of a trustee to give notice to known residuary beneficiaries made void a prior order. Government denies due process of law to a known, interested party if it fails to give him adequate notice of the action. (Citations omitted) The principle has been stated as follows: "When conducting a proceeding which may result in the termination of a citizen's title to property: "[t]he means [of notice employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it.

123. Plaintiff's further allege **fraud upon the court.** the United States Supreme Court explained: There is no question of the general doctrine that fraud vitiates the most solemn contracts, documents, and even judgments. Where the unsuccessful party has been prevented from exhibiting fully his case, by fraud or deception practised on him by his opponent, as by keeping him away from court, a false promise of a compromise; or where the defendant never had knowledge of the suit, being kept in ignorance by the acts of the plaintiff; or where an attorney fraudulently or without authority assumes to represent a party and connives at his defeat; or where the attorney regularly employed corruptly sells out his client's interest to the other side, -- these, and similar cases which show that there has never been a real contest in the trial or hearing of the case, are reasons for which a new suit may be sustained to set aside and annul the former judgment or decree, and open the case for a new and a fair hearing. See Wells,

41

Res Adjudicata, sect. 499; Pearce v. Olney, 20 Conn. 544; Wierich v. De Zoya, 7 Ill. 385; Kent v.

Ricards, 3 Md. Ch. 392; Smith v. Lowry, 1 Johns. (N.Y.) Ch. 320; De Louis et al. v. Meek et al.,

2 Iowa, 55. United States v. Throckmorton, 98 U.S. 61, 68-72, 25 L.Ed. 93 (1878).

124. The Fourth District Court has described extrinsic fraud as follows: Extrinsic fraud involves

conduct which is collateral to the issues tried in a case. . . . [T]his Court has defined extrinsic

fraud as the prevention of an unsuccessful party [from] presenting his case, by fraud or deception

practiced by his adversary; keeping the opponent away from court; falsely promising a

compromise; ignorance of the adversary about the existence of the suit or the acts of the plaintiff;

fraudulent representation of a party without his consent and connivance in his defeat; and so on.

Fair v. Tampa Electric Co., 158 Fla. 15, 18, 27 So. 2d 514, 515 (1946). See Black's Law

Dictionary 595 (rev. 5th ed. 1979). In other words, extrinsic fraud occurs where a defendant has

somehow been prevented from participating in a cause.

125. These elements all pertain to to the actions taken by defendants to prevent plaintiff's from

receiving a full and fair hearing that resulted in the deprivations of their property.

126. While the majority of Judges never knew of the children's guardian's multiple conflicts of

interests, Judge Greider was clearly informed of these facts by plaintiff's mother's petition. The

same petition that was illegally pulled from public record. Furthermore, Judge Greider was

informed of plaintiff's guardian's lies as to the fact that plaintiff's had no assets when attorney

Lance McKinney clearly made her aware of numerous accounts held in plaintiff's names in

Pennsylvania in which their guardian was the trustee and custodian.

127. The fact that Judge Greider denied a review of the Pennsylvania accountings and allowed

Ms. Reiman and Ms. Nicola to proceed in obtaining approval of guardianship accountings

without appointing a guardian ad litem is suspect. It is further troubling that Ms. Reiman's

husband Judge Rosman was copied on her decision and that plaintiff's mother's petition outlining these facts was pulled from public record and hidden, along with seven years of public records relating to this case.

128. Plaintiffs did a bit of investigating into Ms. Reiman and came upon a case that involved an attorney named Alexander Kaplan. While Attorney Kaplan's pleadings number 952 pages and are too lengthy to include in this complaint, he too alleged judicial corruption between Judge Greider and Ms. Reiman, the facts of which are nearly identical to this case. He also discovered the relationship between Ms. Reiman and Judge Rosman and dug up numerous cases in which their spousal relationship may have corrupted many cases in the Florida Courts. Mr. Kaplan has agreed to testify as to his findings if he receives a subpoena.

129. Because petitioners received neither notice of, nor sufficient representation in any proceedings that have led to the loss of all their assets, any judgements, as a matter of federal due process, may not bind them and thus cannot bar them from challenging an unconstitutional deprivation of their property.

130. Because officers of the court committed fraud upon the court as alleged in the underlying facts of this complaint, plaintiff's should not be prevented from pursuing damages against the defendants, as their actions led to the loss or theft of nearly all the children's assets.

131. In Florida the power and responsibility of a court exercising guardianship jurisdiction over minors is such that a court itself is considered to be the minor's guardian. See Brown v. Ripley 119 So. 2d 712.717 (Fla. 1st DCA 1960). It is with this power and responsibility that we ask the State of Florida to step in for the protection of Plaintiff's.

132. Wherefore, plaintiff's are requesting the court declare all four plaintiffs rightful parties and

allow them to pursue any claims or actions against these defendants that deprived them of their

constitutional rights to due process and/or their respective interests in the assets mentioned above

and allow them to seek damages against defendants for the loss of all these assets

## COUNT I : BREACH OF FIDUCIARY DUTY AGAINST ATTORNEYS CATHY REIMAN, LORNA SCHARLACHEN AND TAMARA NICOLA ON BEHALF OF ALL PLAINTIFFS

133. Plaintiffs incorporate by reference paragraphs 1-132, inclusive, of the Complaint as if fully

set forth herein.

134. Under Florida law, a fiduciary duty exists whenever a person places confidence or trust in

another person regarding a particular transaction or in financial affairs, and a breach of fiduciary

duty will arise whenever (1) a fiduciary relationship is established; (2) a breach of that duty is

shown; and (3) that breach of duty is the proximate cause of the plaintiff's damage/harm. A

lawsuit based upon breach of fiduciary duty may proceed in Florida courts as long as the plaintiff

can show that one party has accepted the trust and assumed the duty to protect a weaker party.

See, *Quinn v. Phipps*, 93 Fla. 805, 113 So. 419, 420-421 (1927).

135. As a matter of law Ms. Reiman was a fiduciary to plaintiffs. Her contract states that she was

retained for the benefit of plaintiffs, by their guardian to provide legal services on behalf of

plaintiffs. She also accepted her legal fees from an irrevocable trust to which plaintiffs are

44

beneficiaries.

136. Ms. Scharlachen was a fiduciary to plaintiffs based on a confidential relationship which

existed between the plaintiffs and Ms. Scharlachen. A confidential relationship is created when

circumstances make it certain the parties do not deal on equal terms but on one side there is an

overmastering influence or on the other weakness, dependence or trust, justifiably reposed.

When Ms. Scharlachen took it upon herself to seek out counsel to sue on plaintiff's behalf for

their father's life insurance policy she used her influence over the incapacity of plaintiffs,

knowing their weakness to bring about this lawsuit under the pretense of "protecting" the minor

children. Thus, she assumed a duty to protect the weaker party. She too, accepted her fees from

an irrevocable trust to which plaintiffs are beneficiaries.

137. Ms. Nicola was retained by plaintiff's guardian's by all accounts to circumvent the statutory

requirements of guardian's under Florida Law. However, when Ms. Nicola added the children's

names to her lawsuit as plaintiffs with their guardians, suing the children's mother to try and get

improper legal fees already paid from an out of state trust to which the children were

beneficiaries approved, she accepted the trust and assumed the duty to protect the plaintiff's.

After all, plaintiff's were minor children and could not represent themselves when Ms. Nicola

attached their names as plaintiffs with their guardians. It would be nonsensical to assume that

Ms. Nicola did not assume a duty to them if she is representing them. Had Ms. Nicola disclosed

45

her clients conflicts of interests and requested a guardian ad litem be appointed for plaintiffs, that

duty would have fallen to a guardian ad litem. Since she did not do so, it fell on her.

**\*The lack of privity does not foreclose the possibility of a duty of care to a third party intended to**

**benefit from a lawyer'sservices. This is supported by section 744.1012, Florida Statutes (2009), in**

**which the Legislature states its willful intent to protect incapacitated persons.**

138. Through the foregoing conduct, defendants willingly and fraudulently breached the

fiduciary duty they owed to Plaintiffs by:

1. Failing to administer the fiduciary assets solely in the interests of the beneficiaries and

reckless indifference to the beneficiary's rights.

2. Improperly aiding and abetting plaintiff's guardian in wasting, disbursing,co-mingling,

misappropriating, utilizing and failing to prudently administer assets in which the children were

beneficiaries.

3. Disloyalty through Conflicts of Interest by providing services to the guardians that allowed

them to work adversely against the plaintiffs and in reckless indifference to the beneficiaries

interests.

4. Pursuant to Fla. Stat. 744.108, a guardian or attorney who has rendered services to a ward or

on the ward's behalf is entitled to a reasonable fee and reimbursement of costs upon petition and

order of the court. Contrary to Fla. Stat. 744.108, Defendants Reiman and Scharlachen failed to

46

petition the court and obtain approval prior to accepting fees from the children's out of state

irrevocable trust, let alone whether that out of state trust could pay those fees. Furthermore, the

1994 Trust specifically states that legal fees may only be paid if the trust was in litigation.

4. Rendering legal services to others working adversarially to plaintiffs interests. Under Fla. Stat.

744.331 (2)(c) an attorney for the alleged incapacitated person is precluded from serving as

either the guardian or the attorney for the guardian. Ms. Reiman represented plaintiff's guardian

in numerous adversarial matters. She represented him as Personal Representative of plaintiff's

father's estate in which she allowed properties to fall into foreclosure, attempted to have him

released from any liability, she represented him as a trustee in which she attempted to blackmail

plaintiff's mother into releasing him from liability, she represented him when plaintiffs mother

sought to recover their father's vehicle, she represented him in attempting to get child support

fees paid from an out of state trust and she represented him in attempting to get his guardianship

accounting's approved.

5. filing malicious and meritless lawsuits on behalf of minor children without seeking court

approval.

6. Deliberate omissions of material facts that defendants were required to produce as a matter of

law.

7. Failing to properly respond to requests for information.

47

8. Failing to protect the children's property

9. Failure to act with reasonable competence and diligence

10. Failure to seek court approval before initiating lawsuits on behalf of minors

11. Failure to disclose conflicts of interest to the court

12. failure to seek guardian ad litem for the minor children

13. Improperly accepting legal fees without court approval (Reiman and Scharlachen)

139. As a direct and proximate result thereof, plaintiffs were damaged.

**COUNT II : LEGAL MALPRACTICE, GROSS NEGLIGENCE AND BREACH OF DUTY AGAINST ATTORNEYS CATHY REIMAN, LORNA SCHARLACHEN AND TAMARA NICOLA ON BEHALF OF ALL PLAINTIFFS**

140. Plaintiffs incorporate by reference paragraphs 1-132, inclusive, of the Complaint as if fully set forth herein.

141. Under Florida law, the three elements of a legal malpractice action are generally described as follows: (1).  The existence of an attorney/client relationship between the plaintiff and the attorney (i.e., "Privity of  Contract");  (2).  the attorney's neglect of a reasonable duty; (3) and that such negligence resulted in and was the proximate cause of loss to the plaintiff.The "privity of contract" requirement has been relaxed/eliminated where it was the apparent intent of the client to benefit a third party. It can extend to any third party who was the **intended** beneficiary of the lawyer's work.

142. Through the foregoing acts, Defendant's actions were grossly negligent and fell far below the standards of any reasonably qualified attorney.

(a) failing to act in good faith and with due prudence and diligence in the care and management of the minor ward's interests in trust, estate, custodial, family limited partnership interests and insurance assets.

(b) being grossly negligent in releasing confidential records protected by Federal Law C.F.R 42 (part 2) to a life insurance company, that resulted in and was the sole reason for the denial of this policy. Thereby, costing the minor children the ability to collect the full policy benefits. (Scharlachen)

(c) improperly attempted to interject claims to the life insurance policy, prior to it being paid out and without any legal ground favoring that action or court approval, thereby placing the policy in jeopardy.(Reiman and Scharlachen)

(d) acting in bad faith because of an irreconcilable conflict of interests against the minor children's mother, as the support beneficiary to all trust, estate and life insurance monies, causing loss to all those assets in which the minors held beneficiarial interests

(e) failed to deliver a Maserati automobile, a violation of this Court's Order dated February 27th, 2007; which was left not only to plaintiff's mother, but to plaintiff's and was the last tangible reminder of their father;

(f) failed to pursue monies owed to the minor's father's Estate arising out of the minor's deceased father's interests in various business entities;

(g) failed to properly value the minor's father's interest in various LLC's, partnerships and

corporations;

(h)    wrongfully allowed plaintiff's guardian to co-mingle estate funds, trust funds, custodial accounts and guardianship accounts without disclosing that to the court;

(i)    failed to liquidate the minor father's interest in various partnerships, LLC's and/or corporation, thereby depriving Estate and minor children of significant assets;

(j)    failed to properly account for trust assets, custodial assets, guardianship and estate assets for the minor children;

(k)    pushed properties into foreclosure or allowed them to fall into foreclosure

(l)    accepted legal fees from irrevocable trust funds without court approval  (Reiman and Scharlachen)

(m) filed meritless lawsuits in plaintiff's names without court approval while plaintiffs were under a guardianship

(m)  and for all other actions  which were adversarial to the beneficiaries, resulting in millions lost in all the assets in which the minor children held interests;

143. Plaintiffs were the intended beneficiaries of all these assets as stated under the terms of wills and trusts were all injured and suffered actual monetary harm by reason of Defendant's gross negligence and egregious conduct, such harm including without necessary limitation loss of income, loss of investments, loss of distributions and depletion of net worth

**COUNT III : CIVIL CONSPIRACY AGAINST ATTORNEY REIMAN, ATTORNEY SCHARLACHEN AND ATTORNEY NICOLA ON BEHALF OF ALL PLAINTIFFS**

144. Plaintiff's incorporate by reference paragraphs 1-132, inclusive, of the Complaint as if fully set forth herein:

145. A civil conspiracy in Florida, consists of the following elements: " (a) a conspiracy between two or more parties, (b) to do an unlawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts performed pursuant to the conspiracy." Walters v. Blankenship, 931 So.2d 137, 140 (Fla. 5th DCA 2006)

146. It is clear through the various communications and acts that these three attorneys worked together conspiring to cover up wrongful acts.

147. Ms. Nicola's e-mail in which she outlines her "creative" way to get the court to overlook the fact that excessive monies for the children had already been taken out illegally and from a Pennsylvania Irrevocable trust could not better sum up the years of conspiracy these three attorneys plotted. It also shows that they worked in tandem to deceive the court.

148. Defendants deliberately and with malice created a storm of litigation between family members to keep their legal fees coming, they launched so much litigation that plaintiff's elderly grandfather (a 74 year old man at the time) did not even seem to understand why or what he was suing about.

**LINCOLN FINANCIAL DEPOSITION OF ALBERT M. HOLTZ 2010:**

**Answer:** (Albert Holtz)" Forgive me, I'm—I got so many—there has been so much going on, I can't—I'm not going to be great on that date, I guess " **Question:**(attorney Jonathon Robbins) By the way, is there any reason or are you taking any medications or suffering from any conditions which might affect your memory or your recollection in any way or is it just a matter of you just don't---

**Question:**(Robbins) Part of the lawsuit against Meghan was also—had to deal with the insurance policy at issue in this lawsuit, did it not? **Answer:** (Holtz) Wait a minute. Now I'm confused now. Say it again. **Question:** Okay, originally you and Mildred filed a lawsuit against Meghan and

51

against Lincoln National. Do you recall that? **Answer:** Filed a lawsuit against Meghan. No. I thought she was the one that brought that. I may have been getting confused here. It's so much.**Question:** Do you recall—**Answer:** What did I bring against Lincoln National?

149.  As a direct and proximate result thereof, plaintiffs were damaged.

## COUNT IV : INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AGAINST ATTORNEY REIMAN, ATTORNEY SCHARLACHEN AND ATTORNEY NICOLA ON BEHALF OF ALL PLAINTIFFS.

150. Plaintiff's incorporate by reference paragraphs 1-132, inclusive, of the Complaint as if fully set forth herein :

151. The Elements of a cause of action for intentional infliction of severe emotional distress, also referred to as "outrageous conduct causing severe emotional distress are (1) the wrongdoer's conduct was intentional or reckless, that is, he intended his behavior when he knew or should have known that emotional distress would likely result. (2) the conduct was outrageous and is to be regarded as odious and utterly intolerable in a civilized community; (3) the conduct caused the emotional distress; and (4)the emotional distress was severe. _**Dominquez v. Equitable Life Assur.Soc. of U.S. 438 So. 2d 58, 59 (Fla. 3d DCA 1983)**_ The Florida appellate courts have stated the test to state a claim for IIED as follows: "[An IIED] case is one in which the recitation of facts to an average member of the community would arouse his resentment against the actor and lead him to exclaim, "Outrageous!."_**Food Fair, Inc. v. Anderson, 382 So. 2d 150, 153 (Fla. 5th DCA 1980).**_

152. The Florida appellate courts have held that, as a matter of law, the following three situations generally provide the "Outrageous!" conduct to support a lawsuit for intentional infliction of

52

emotional distress: 1. IIED upon children. 2. IIED where a company abuses its power, position of trust, or fiduciary duty for financial gain; and 3. IIED upon families.

153. Wherein the underlying facts of this Complaint show that these three instances are all applicable to plaintiff's claims and that defendants have acted maliciously towards their clients and the intended beneficiaries of their work, where they "obfuscated, manipulated and deceived both the court and plaintiffs for financial gain in a tortious attempt to deprive plaintiffs of their assets and inheritance, causing plaintiffs to lose their homes, be pulled from their school, deprived plaintiffs of a liberty interest with their mother and forced them to suffer severe economic deprivations that no child should have to endure, that defendants have inflicted extreme emotional distress upon the minor children by and through their actions.

154. As a direct and proximate result thereof, plaintiffs were damaged.

**WHEREFORE,** Plaintiffs pray:

1. for a declaratory judgement that plaintiffs were deprived of due process and victims of fraud upon the court, that they are beneficiaries and interested parties and shall be allowed to pursue any claims and/or damages they incurred as a result of defendant's malicious actions;

2. for damages as determined by the jury awardable to each plaintiff;

3. compensatory damages for breach of fiduciary duty to plaintiffs;

53

4. for compensatory damage in the amount to be decided at trial by jury for injury resulting from loss of plaintiff's current and prospective income, emotional distress, loss of relationship with family members

5. for punitive damages as determined by the jury awardable to each plaintiff in an amount to be determined at trial for the wanton, malicious, and intentional nature of Defendant's conduct, to deter them from further such conduct;

6. for an award of their reasonable attorneys' fees and costs:

7. for the right to amend their Complaint as appropriate :

8. for interests and costs allowed by law:

9. for such other and further relief as this Court deems appropriate

**JURY TRIAL DEMANDED**

Respectfully Submitted,

Cailin Nicole Soloff and Dylan Michael Soloff
on behalf of themselves and as friends of the
minors, B.S and L.S

We declare under penalty of perjury that the
above information is true and accurate to the
to the best of our belief and understanding
Date: 7/21/17

Cailin Nicole Soloff
31622 Fairview Rd.
Laguna Beach, CA 92651
cailinsoloff@gmail.com

54

(949) 426-9277

Dylan Michael Soloff
31622 Fairview Rd
Laguna Beach, CA 92651
dsoloff99@gmail.com
(949) 244-8729

cc: Mr. Ian Weinstein, Esq. via e-mail
    Professor of Law Fordham University
    IWEINSTEIN@law.fordham.edu

cc: Mrs. Meghan Soloff, via e-mail
    MeghanSoloff@yahoo.com

55